*Mr. William D. Wolfskeil,* for the appellant.

*Mr. Samuel Schleimer,* for the respondent.

PER CURIAM.

The decree in the above cause is affirmed, for the reasons given by Vice-Chancellor Stevens in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, DIXON, FORT, PITNEY, SWAYZE, VREDENBURGH—6.

*For reversal*—GARRISON, VROOM, GREEN, GRAY—4.

---

EMMA W. COOK, executrix, &c., respondent,

*v.*

WILLIAM W. WEIGLEY et al., appellants.

[Submitted July 12th, 1904.   Decided December 9th, 1904.]

Where a conveyance of mortgaged property contained no covenants of title whatsoever, and at the time of making the mortgage for a part of the price the parties had knowledge that the state claimed that the mortgagee's title was defective, a suit to foreclose the mortgage should not be stayed until the conclusion of a pending action by the state claiming an outstanding title in a part of the mortgaged premises.

---

On appeal from a decree of the court of chancery advised by Vice-Chancellor Reed, who filed the following conclusions:

This is a suit to foreclose a mortgage upon property known as Oyster island and Robbins reef, lying in New York harbor, in the county of Hudson. It is admitted that the mortgage was duly executed, and that by its terms the amount of the principal sum, with interest, is now due.

The defences interposed are—*first,* that the mortgage was given in pursuance of a scheme in which all the parties were concerned, the purpose of which was to sell the mortgaged property as a speculative enterprise and to pay the mortgage out of the moneys realized when the sale occurred and not until then; *second,* that an action is pending by the State of New Jersey, claiming an outstanding title in a part of the mortgaged premises, and that this being a purchase-money mortgage, this court should stay this suit until the other suit is determined; *third,* that an agreement was entered into that no proceeding should be taken to foreclose the mortgage until the suit of the state was ended; and *fourth,* misrepresentations as to the title to the property mortgaged and failure of consideration.

In support of the first of these defences the defendant produced in evidence a history of the dealings of the parties respecting the mortgaged property. Robbins reef and Oyster island appear to have been the subject of discussion between Mr. William M. Force, the registrar of the board of proprietors, and Professor George Cook as early as 1878. The point discussed was whether these islands were upland and so were the property of the board of proprietors. In 1880 they were surveyed and a return made to Professor Cook. In 1887 Professor Cook entered into an arrangement with one Ezra A. Hayt, by which the latter was to secure a sale of the property. By an agreement, dated August 31st, 1887, Hayt was to have an option to purchase the said property for the price of $100,000, the option to end October 1st, 1887. By another agreement of the same date between the same parties, Professor Cook agreed to pay Hayt a commission on said sale of fifty per cent. or $50,000 of the consideration money. No sale having been made within the time limited, another agreement was entered into between Professor Cook and E. A. Hayt on May 1st, 1888, similar in terms to the preceding agreement of August 31st, 1887, excepting that the price was to be $250,000. By another agreement of the same date, Hayt was to have fifty per cent. or $125,000 commission. These agreements were extended to September 25th, 1889.

By an agreement of June 24th, 1889, the preceding agreéments were extended to September 15th, 1890, the consideration of which extension was the sum of $10,000, to be paid by Hayt on or before September 15th, 1889, which said $10,000 was to be credited as part of the purchase-money. Similar agreements were entered into between the board of proprietors and Mr. Hayt.

All this time Hayt had been trying to effect a sale of the islands and had engaged the services of Colonel Weigley, the defendant, to assist in making a sale. A formidable obstacle in the way of any sale was the fact that the board of proprietors, claiming that the location in favor of Professor Cook was void, had made a new location in favor of one Charles E. Noble. The parties had also projected and incorporoated a railroad, which was to run from the main land to the island. On September 24th, 1890, Colonel Weigley conveyed ten acres of Oyster island to the New Jersey Terminal Railroad Company. The State of New Jersey raised another obstacle in the way of selling the property by asserting that the land sold to the railroad belonged to the state previous to the execution of the deed to Weigley, viz., in February, 1889, who later had an interview with Hayt, who broached to him a proposition for the sale of the property to the Pennsylvania Railroad Company. On March 22d, 1889, Mr. Hayt and Colonel Weigley entered into an agreement, fixing the commissions which Colonel Weigley should receive for his services in making the sale. On August 14th, 1889, Mr. Hayt wrote to Colonel Weigley concerning a prospective sale to the owners of the Inman line of steamers, and tells Weigley that he (Hayt) had arranged to have deeds made and deposited with a trust company, to be delivered on payment to the trust company of a certain sum of money. It appears that Mr. Jacob Weart, who seems to have been the New Jersey counsel for all the parties, had advised the sale of the property to someone and the execution of a purchase-money mortgage back to the vendors, the Cooks. Such a deed, under date of September 9th, 1889, was prepared on September 13th, 1889, and an agreement was signed by Professor Cook and Colonel Weigley, reciting this deed and declaring that the intent of the

parties was that the deed should be delivered to Weigley or to his assignee, provided he pay, or cause to be paid, to the said trust company, for the use of said Cook, the sum of $10,000 on or before September 29th, 1889, and the sum of $90,000 on or before September 15th, 1890, and in default of said payments the deed should be returned to the Cooks.

On September 15th, 1890, Mary H. Cook, individually and as executrix of George H. Cook, he having died, executed a deed for the two tracts to William W. Weigley.

On September 25th, Colonel Weigley wrote to the American Loan and Trust Company, enclosing $5,000 in cash and a note, made by Appleton to the order of Hayt. Mr. Weigley stated in this letter that the $5,000 in cash was for the Cooks, and that Hayt, who, under the agreement between him and Professor Cook, of May 1st, 1888, was entitled to one-half of the consideration money obtained on said sale, had agreed to accept the note of Daniel S. Appleton and authorized the company to deliver the note to Mr. Hayt, and to place the cash to the credit of Professor Cook's representatives.

On October 30th, 1889, Mr. Hayt wrote to Mr. Weigley that the State of New Jersey intended to set up a claim to Oyster island through the attorney-general, and proposed a plan by which the state and Mr. Hayt, with the consent of the other shareholders, could improve the flats.

On December 22d, 1903, Colonel Weigley executed a declaration of trust, in which he recited the execution of the deed from the Cooks to himself, the execution of his deed to the New Jersey Terminal Railway Company, and the execution of a deed by it to the Atlantic Terminal Railway, the execution of a bond and mortgage back to him by the said company to secure $1,500,000; that he (Weigley) had previously executed several declarations of trust, and then proceeded to declare that he held the title to said property and to the mortgage upon the following trusts: three-eighths part for the benefit of the executors of Daniel S. Appleton, three-eighths part for the use of Hayt, and two-eighths for himself; he reserved a right to sell the property and mortgage, while Appleton held a beneficial interest in it at a price to be mutually agreed upon by the parties in interest;

and then declares that out of the proceeds of the sale he was to pay himself, for services as trustee, the sum of $25,000, and then the amounts agreed upon by a schedule attached to an agreement dated in January, 1892. The amounts to be paid, according to this schedule, were $25,000 to Mr. Weigley; $40,000, and interest thereon, to Mrs. Cook, and various sums to Mr. Hayt, Mr. Force, Mr. Appleton and others for services of different kinds. It is to be remarked that Mr. Force, by an agreement with Professor Cook, had had a one-half interest in the property. Force retained a one-half interest in the mortgage to Mrs. Cook, and by an agreement with Mr. Hayt, unknown to the Cooks, retained a one-half interest in the proceeds of the sale of the property, when made. The property is still unsold.

From this bare statement of the skeleton facts of the transaction, supported by the testimony of Mr. Jacob Weart, the counsel of the parties, and supported by the details of the transaction, too numerous and minute to be displayed at length, it appears to me clear that the first point of the defences is without foundation.

At the time the mortgage was executed to Mrs. Cook, it was undoubtedly the expectation of Mr. Force, Mr. Hayt and Mr. Weigley that the property would be sold before the maturity of the mortgage. It was therefore expected that the mortgage should be paid out of the proceeds of the sale. This was expected with such confidence that no agreement that the mortgage should await the sale of the property was made, either in writing or verbal. While this was expected, there was no contract of that sort entered into. The whole transaction shows that it was intended that the interests of Cook thereafter in the premises should be limited to the amounts fixed by the mortgage, and in the speculative interest in the equity of redemption the Cooks thereafter should have no interest whatever. The contingent interest of the Cooks in the proceeds of any sale was changed into an absolute right to be paid, in addition to the cash received by her, the sum of $40,000, secured by the mortgage. Of course, on this simple bill for foreclosure, and not for reformation, no parol evidence would be of the least service in varying the terms of the mortgage; but if it were available, it is sufficient to say

that there is not a scrap of testimony to show that the mortgage was not intended to be exactly as it is. Nor is there any agreement shown after the execution of the mortgage for its extension, except those that appear in writing. These various written agreements for extensions—one obtained by the payment of a money consideration—are utterly inconsistent with any understanding otherwise entered into that the mortgage was not to be paid until the property was sold.

Nor do I find any substance in the second point of the defence, viz., that there is a suit pending between the State of New Jersey and the terminal railway company—a grantee from Weigley—in which the state asserts a title paramount to that of the Cooks, and in which suit an injunction restraining the railway company from constructing its road is pending.

It appears that on November 24th, 1890, the State of New Jersey, by its attorney-general, filed a bill against the railway company, obtained an injunction restraining the railway company from taking possession of Oyster island, and the injunction is still in force. The deed by Mary H. Cook to Colonel Weigley contained no covenants for title whatever.

It is one of the most settled principles of the law of vendor and purchaser that the purchaser, who has received no covenants which cover a defect or encumbrance, can neither retain the purchase-money nor recover it back if already paid. Unless there has been fraud, he is absolutely without relief against his vendor, either at law or in equity. *Rawle Cov. Tit. 607.*

The rule in such instance is *caveat emptor,* and the vendee has no remedy for failure of title, except such as may be provided for by covenants in the conveyance. *Phillips and Sheddon* v. *City of Hudson, 31 N. J. Law (2 Vr.) 143; Slocum* v. *Seymour, 36 N. J. Law (7 Vr.) 138–141.* Where there is no mistake or misrepresentation as to facts, and no fraud and no warranty of title, the purchaser has no redress at law or in equity. *Hampton* v. *Nicholson et al., 23 N. J. Eq. (8 C. E. Gr.) 423–427.*

For these reasons, on foreclosure of a purchase-money mortgage, a defence that there is an outstanding paramount title to

all or a portion of the property sold, in the absence of fraud, must rest upon the covenants in the conveyance to the mortgagor. *Jones Mort.* § *1501.* It follows, therefore, that the pendency of the injunction suit is no reason for staying the present suit.

In respect to the third point, namely, that an agreement was entered into with Mr. Weigley that no proceedings would be taken to foreclose this mortgage until the injunction suit was ended, it is sufficient to say that Professor Cook never entered into such an agreement with Mr. Weigley; indeed, Mr. Weigley says that he never saw the Cooks.

Mr. Hayt was the one with whom Mr. Weigley says the arrangement was made, but Mr. Hayt possesses no power to bind the Cooks, after the property was conveyed to Mr. Weigley and the mortgage was executed.

Lastly, it is insisted that the sale to Mr. Weigley was induced by false representations or fraudulent concealment of facts respecting the property sold. It is clear that Mr. Weigley knew of the Noble survey at the time he gave the mortgage. He had been notified by the board of proprietors of the Noble survey on July 8th, 1890. As to the claim of the state, Mr. Weart wrote to Colonel Weigley, under date of September 20th, 1890, concerning the mortgage, which seems not then to have been actually executed, and telling him that it would block the proprietors and State of New Jersey. After he had knowledge of these claims he raised no question respecting the validity of the deed to him and his mortgage to the Cooks. He proceeded to get extensions of time for the payment of the mortgage—in fact, Colonel Weigley himself held the title only for the accomplishment of the speculative purposes of Hayt, Force and Appleton. They all knew the character of the title to this property, and it was because of their knowledge that the deed and mortgage were executed, under advice of counsel. The result of the execution of the deed and mortgage was, as already remarked, to eliminate the Cooks from participation in the prospective results of the speculation, amounting to $1,500,000, and to secure them absolutely by the payment of $40,000, or their share of it under an agreement with Force.

It is to be observed that the charge of fraudulent representations or concealment is referable only to the existence of the Noble survey and the claim of the state.

In respect to any alleged representations that the islands were mainland or that the Cook survey constituted a paramount title, there is nothing to show that such was not believed by all the parties and nothing in the case to show that such is not the fact.

Nor do I see any defence arising out of the fact that the representatives of Force have a half interest in the mortgage under foreclosure.

If anyone has cause to complain of the conduct of Force, it seems to be the Cooks. Force was obviously influential in shifting the entire interest of Professor Cook in the property to an interest in the mortgage, while he (Force) retained an interest in the equity of redemption. But in respect to Colonel Weigley, nothing appears to show that he was influenced in taking his deed and executing his mortgage by any false representations or fraudulent concealment by Force.

As already observed, he knew, or had knowledge sufficient to put him upon inquiry, of the condition of the property which he took for the purpose of effecting a sale.

I conclude that there should be a decree for the complainant.

*Messrs. Vroom, Dickinson & Scammell,* for the appellants.

*Mr. Frank Durand,* for the respondent.

PER CURIAM.

The decree is affirmed, for the reasons given in the court of chancery.

*For affirmance*—DIXON, GARRISON, FORT, GARRETSON, PITNEY, SWAYZE, BOGERT, VREDENBURGH, VOORHEES, GREEN, GRAY —11.

*For reversal*—None.